14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 1 of 93

PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                            1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Index No. 11-10219 (ALG)

5  --------------------------------------

6  In Re:

7  KENNETH IRA STARR, et al.,

8                    Debtors.

9  --------------------------------------

10  ROBERT L. GELTZER, as Trustee of the

11  Estate of KENNETH IRA STARR, et al.,

12                    Plaintiffs

13     -versus-

14  SUSAN JAFFE TANE,

15                    Defendant.

16  --------------------------------------

17

18          DEPOSITION OF PETER M. LEV, E.A.,

19  the witness herein, taken at the offices of

20  the The Solovay Practice, 260 Madison Avenue,

21  New York, New York, on April 20, 2015, at

22  10:25 a.m., before Robert Bloom, a Shorthand

23  Reporter and notary public, within and for

24  the State of New York.

25



PETER M.  LEV, E.A.                                        April 20, 2015
GELTZER vs. TANE                                                        2

```
 1

 2   A P P E A R A N C E S :

 3

 4   TARTER KRINSKY & DROGIN LLP

 5   Attorneys for Plaintiffs

 6           1350 Broadway

 7           New York, New York 10018

 8      BY:   GREGORY J. SKIFF, ESQ.

 9

10

11   THE SOLOVAY PRACTICE

12   Attorneys for Defendant

13           260 Madison Avenue

14           15th Floor

15           New York, New York 10016

16      BY:   NORMAN SOLOVAY, ESQ.

17

18

19

20

21

22

23

24

25
```



PETER M.  LEV, E.A.                                      April 20, 2015
GELTZER vs. TANE                                                    3

1

2

3          IT IS HEREBY STIPULATED AND AGREED

4   that all objections, except as to the form of

5   the questions, shall be reserved to the time

6   of the trial;

7          IT IS FURTHER STIPULATED AND AGREED

8   that the within examination may be subscribed

9   and sworn to before any notary public with

10  the same force and effect as though

11  subscribed and sworn to before this court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



 1

 2          Whereupon,

 3                PETER M. LEV,

 4      after having been first duly sworn, was

 5      examined and testified as follows:

 6  EXAMINATION BY

 7  MR. SOLOVAY:

 8      Q.    Mr. Lev, pursuant to a Notice of

 9  Deposition that we have sent you, and this is

10  a copy, it asked you to produce all pertinent

11  documents, and you have done that for us?

12      A.    Yes.

13      Q.    Originally I had had a discussion

14  with you, which was reflected in a Verified

15  Answer which has been served here, and in

16  that answer I had said:  Mark Bruh, a lawyer

17  for the trustee, had at one point suggested

18  to Lev that he might be called upon to

19  testify.   Lev had responded that you would

20  have to be crazy to call me because, as he

21  made clear, he would have to testify as to

22  the fraudulent nature of the debtor's books

23  and records.

24          You saw a copy of that Answer?

25      A.    Yes, Norman.



                          P. Lev

1

2        Q.    And you corrected my quote of you?

3        A.    Yes, I did.

4        Q.    That quote is therefore more

5    correctly reflected in the Amended Verified

6    Answer that has been submitted.

7              MR. SOLOVAY:  You have copies of

8         this?

9              MR. SKIFF:  Yes.

10       Q.    That quote was:

11             "Lev acknowledged having had a

12   discussion with Mark Bruh, the lawyer for the

13   trustee, after Mr. Bruh had indicated the

14   possibility to Lev that he might be called

15   upon to testify.  Lev had replied that 'you

16   would not want me on the stand under oath to

17   testify about what was going on at Starr,

18   given that my 401(k) money was being stolen

19   beginning in late 2009, that I wasn't being

20   paid my business expenses that would normally

21   have been reimbursed and, in fact, my last

22   paycheck at the time of my departure had

23   bounced.'  Lev went on to say to Mr. Bruh:

24   Since I had proven in three clients' cases

25   that the bills were, in fact, paid in full,



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 6 of 93

PETER M. LEV, E.A.                                                    April 20, 2015
GELTZER vs. TANE                                                              6

```
 1                    P. Lev

 2    doesn't that say something about the accuracy

 3    of the books that you inherited."

 4         A.    That is what I said.

 5         Q.    That is a corrected version of the

 6    discussion?

 7         A.    Yes.

 8         Q.    I take it you stand by that?

 9         A.    I stand by what I said in that.

10         Q.    In the Amended Verified Answer?

11         A.    Yes.

12         Q.    You had, as of June 10, 2014,

13    written a letter to Mr. Bruh with whom those

14    discussions took place?

15         A.    Yes.

16         Q.    And is this a copy of that letter?

17         A.    Yes, it is.

18              MR. SOLOVAY:  I would like to mark

19         that as Defendant's Exhibit 1.

20              (Defendant's Exhibit 1, Letter,

21         marked for identification, as of this

22         date.)

23    BY MR. SOLOVAY:

24         Q.    The letter speaks for itself, but

25    in this letter you discussed a number of
```



```
 1                    P. Lev

 2   bills from Starr to people you were

 3   representing, is that correct?

 4         A.    That is correct.

 5         Q.    And you described each of those

 6   cases in this letter one by one?

 7         A.    Yes.

 8         Q.    In some of those cases, the

 9   comments that you made resulted in a

10   withdrawal of the claim, is that correct?

11         A.    That is correct.

12         Q.    In how many cases?

13         A.    Three cases I produced evidence

14   showing 100 percent of the outstanding bill

15   having been paid.

16         Q.    In the remainder of these cases,

17   were there any others that, as far as you

18   were concerned, where the billing was

19   incorrect?

20         A.    As I wrote to Mark and as I

21   reviewed the records that were being

22   presented to me, considering I had 27 prior

23   years of experience working at the firm and

24   knowing what clients' billings were and

25   should have been, it was clear in a few of
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                              8

```
 1                    P. Lev
 2   those cases that billings seemed excessive
 3   compared to what their regular routine annual
 4   accounting fees should have been.
 5              And in those cases, the bills
 6   relating to right before the demise of Starr
 7   & Company, they were in the couple of months
 8   leading up to the May 2010 demise -- well,
 9   Mr. Starr's arrest and then the demise of
10   Starr & Company.
11              So in my mind it presented a
12   problem of what I felt was a discrepancy.
13        Q.    There were other of these cases
14   that were withdrawn that you ended up paying,
15   is that correct?
16        A.    That is correct.
17        Q.    Was that because you felt those
18   bills were correct?
19        A.    No.
20              I felt that rather than getting
21   the client involved in any kind of protracted
22   type of litigation, if there was the ability
23   to settle something it was going to be
24   advantageous for the client, for myself and
25   the time that it would take and the expense
```



```
 1                      P. Lev

 2    to just get it paid.

 3              But I still felt, and Mr. Bruh

 4    knew, that I was still very much not feeling

 5    that those bills were correct.

 6        Q.    What led you to that belief or

 7    feeling?

 8        A.    Well, considering I had gone many

 9    a time to the controller at Starr & Company

10    with billing discrepancies of clients who

11    complained that an outstanding balance was

12    not correct, where was a payment reflected,

13    why was a bill sent to a wrong address, why

14    wasn't something updated, I mean, there was a

15    pattern of sloppiness of the books and

16    records of Starr & Company, and I would be

17    sometimes on the receiving end of a phone

18    call from the client.

19        Q.    To what do you attribute those

20    discrepancies, why were the books likely to

21    be incorrect?

22        A.    I think as Mr. Starr leading up to

23    his arrest and the demise of Starr & Company,

24    I think it was very clear that the firm and

25    he, himself, was bleeding money to the point
```



```
 1                      P. Lev
 2    where he was taking bank loans.
 3              I learned about my 401(k), money
 4    being stolen.   And there was no Starr &
 5    Company matching, it was 100 percent my
 6    money, and so as I maxed out on a 401(k) of
 7    $300 a week, that money was never making it
 8    into the coffers of my 401(k) investments.
 9    My unreimbursed business expenses were going
10    unpaid month after month even though I asked
11    for the payment.
12              And then as I represented, even in
13    the comment of the quote, my last paycheck as
14    I had already departed to where I was
15    planning my departure of Starr, bounced right
16    up to the time of Mr. Starr's arrest and
17    demise.
18         Q.   When do you think this problem
19    with the books first arose, at what time and
20    in what connection?
21         A.   I believe in '09 there was an
22    exodus of clients that was happening by the
23    day, by the week.
24              At that point, a lot of
25    information, I think, was out there in public
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                11

```
 1                    P. Lev
 2   about Mr. Starr, of clients speaking of
 3   lawsuits that were impending, and so I think
 4   it was very clear that as clients were
 5   leaving, the amount of expense he had to
 6   cover, the 17,000 square foot office, what
 7   was at one point an 80-person payroll, it was
 8   very obvious that there was problems there.
 9        Q.    The office, the more elaborate
10   office was moved into when?
11        A.    Best recollection, it had to be
12   somewheres around '04, '05.  850 Third Avenue
13   from 350 Park Avenue.
14        Q.    That was the beginning of the
15   financial crunch that was experienced by the
16   firm?
17        A.    I think the financial crunch came
18   when Mr. Starr decided that he also wanted to
19   be Starr Investment Advisors, an SEC licensed
20   entity, and he ramped up with I guess an
21   investment department, so the firm grew in a
22   way and given the nut -- again, I don't
23   believe for a moment that he was able to
24   achieve the kind of dollars or economies of
25   scale of the expense it would have taken to
```



```
 1                    P. Lev
 2   have run an entity of that size.
 3        Q.    By 2008, had this financial crunch
 4   manifested itself?
 5        A.    Well, '08 is one of those unique
 6   years that you had the collapse of Bear
 7   Stearns in the early part of '08, you had the
 8   collapse of Lehman Brothers in the latter
 9   part of '08.   You're coming into that whole
10   period of the Madoff problem.
11              To answer your question, yes,
12   absolutely.   The problems were starting to
13   manifest themselves in '08.
14        Q.    Just to jump ahead for a minute,
15   the client on whose behalf I am here today,
16   Susan Tane, by '08, had she sustained some
17   significant losses?
18        A.    Yes.   Investments on a number of
19   client cases including Ms. Tane, of which I
20   was the business manager on that account.
21   The business of Starr & Company Business
22   Management and Starr Investment Advisors,
23   between the accounting work that we did for
24   certain clients, investment advisory work for
25   others, and Susan, again not to jump around,
```



PETER M. LEV, E.A.                                         April 20, 2015
GELTZER vs. TANE                                                       13

```
 1                      P. Lev
 2   Susan was one of those clients where we did
 3   some tax work and we did the investment
 4   advisory services, and yes, a couple of the
 5   investments very clearly did not pan out well
 6   for Susan and she did lose.
 7        Q.    Did she end up in 2008 with some
 8   substance losses?
 9        A.    Absolutely.   There were.
10        Q.    How large were they, roughly
11   speaking?
12        A.    If I had to venture from memory as
13   to what kind of numbers, I mean, they
14   probably were in the half million to million
15   dollar range on what was given to Starr to
16   invest and manage.
17        Q.    We'll come back to Susan before we
18   leave.   Before reaching her case, let's go
19   to a few of the other cases that you felt you
20   learned the books were being mismanaged in
21   regard to that, is that accurate?
22        A.    Yes.
23        Q.    That is an accurate description of
24   what happened?
25        A.    Yes, because I was on the
```



```
 1                    P. Lev
 2   receiving end of phone calls, as I mentioned,
 3   of billing discrepancies and of issues.   And
 4   even things such as updating an address of
 5   record for billing purposes.
 6        Q.    That was Susan Tane's problem,
 7   among others?
 8        A.    Among other clients problems, too.
 9        Q.    Let's go to a few of the specific
10   cases where the billing was clearly wrong and
11   inaccurate.
12             You had another client named
13   Frances Singer Hayward, is that correct?
14        A.    That is correct.
15        Q.    You brought a record of her
16   payments and problems.
17             Is this a copy of that record?
18        A.    This package here, which related
19   to the Geltzer office asserting that there
20   was an outstanding balance in Ms. Hayward's
21   case of what was 45,000, which then got
22   adjusted to $30,000, one quarter disappeared.
23   When Frances Hayward became a client of Starr
24   & Company in '06, if I'm not mistaken, she
25   came in with $6 million that she gave Starr &
```



```
 1                    P. Lev
 2    Company to manage.   Ken would charge a
 3    client 1 percent of the gross amount of
 4    money, so in Frances's case, Ms. Hayward's
 5    case, 1 percent of 6 million would be $60,000
 6    per annum.   $60,000 per annum divided by
 7    four quarters is 15,000 a quarter.
 8              The only problem is that Frances
 9    was involved with a vanity project.  I wrote
10    that in a letter to Mark as I was trying to
11    discuss that clearly the billing was
12    inaccurate.
13              Frances, Ms. Hayward, had spent
14    millions of her own dollars of those 6
15    million as she was withdrawing the funds for
16    a project called Amigo the Dog, Amigo the Pot
17    Cake Dog.
18         Q.    That was a film?
19         A.    That was a film that she made.
20    She spent millions of dollars on that vanity
21    project.   The 6 million over the course of a
22    year or two became 2 million, 1 million and
23    she basically spent her entire fortune on
24    this project.
25              So, therefore, the billing of
```



                    P. Lev

2  Starr & Company, which was still showing up

3  at 15,000 if it was truly based on -- which

4  in Frances's case -- it was based on the

5  gross investable amount.  It never got

6  adjusted.   It never got changed.   It wasn't

7  that 6 million anymore.

8          So 6 million, as I said, could

9  have been 1 million at that point, and 1

10  million therefore at 1 percent would be

11  $10,000.   But there was no money.   When she

12  left the firm before she retained me after I

13  opened up my own office, she was already in

14  the throes of tax liens from the IRS, from

15  New York State.  Didn't have enough money to

16  pay her Medicare bills or utility bills, and

17  had to sell an apartment that was on the

18  market to basically just get money to live

19  off of.   And then, of course, after the sale

20  of the apartment came the settlement of all

21  the tax liens and levies that were ongoing.

22          So I highlight this particular

23  case about billing inaccuracies.  And it goes

24  back to even some of the comments that I make

25  about Mr. Starr's firm, about Starr & Company



PETER M. LEV, E.A.                                            April 20, 2015
GELTZER vs. TANE                                                          17

```
 1                    P. Lev

 2    propping up receivables and not in the

 3    interest of the company.  If Mr. Starr was

 4    out there getting bank loans and in need of

 5    cash infusions from the financial world, it

 6    was better to leave the balance out there and

 7    not make the changes.

 8         Q.    Is it your impression that Mr.

 9    Starr and his keeper of the books were

10    deliberately enhancing the size of the

11    balance sheet?

12         A.    I have to believe that that is a

13    true statement.

14         Q.    And that the books were

15    essentially cooked, as I would describe it as

16    a lawyer, is that your belief about what was

17    happening?

18         A.    That's my belief.

19         Q.    What did happen as far as this

20    account was concerned?

21         A.    In terms of today?

22         Q.    What happened, what was the

23    trustee's reaction to all of this information

24    you provided?

25         A.    I provided everything that is in
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 18 of 93

PETER M.  LEV, E.A.                                      April 20, 2015
GELTZER vs. TANE                                                    18

```
 1                    P. Lev

 2    that packet, the warrants, the liens, the

 3    trustee dropped any pursuit of monies on

 4    behalf of that client.

 5         Q.    As well they might have.

 6              You said there were three specific

 7    cases.  You had how many cases that you were

 8    representing former Starr people in?

 9         A.    I believe 9.

10         Q.    All told, were there about 12, or

11    am I mistaken?

12         A.    A couple of clients, the Geltzer

13    office went directly to the client.

14              These, I guess, when they

15    inherited the records, showed that Peter Lev

16    Business Management, the firm I formed after

17    my departure from Starr & Company, were "the

18    accounting or business managing firm of

19    record," because all these clients had put in

20    their notice of termination letter saying all

21    books and records should belong to Peter Lev

22    Business Management.

23              But there were a couple of other

24    clients that the Geltzer office would have

25    gone directly to the client and the clients
```



```
 1                    P. Lev

 2   would have reached out to me but they're not

 3   listed.

 4        Q.    In that letter that you wrote?

 5        A.    Right.

 6        Q.    You had a total, am I right, of 12

 7   clients you represented?

 8        A.    12, inclusive of the few.    And in

 9   one case, a client by the name of Paige

10   Turko, there was a thousand dollars

11   outstanding, and that balance went away

12   without even hearing anything.

13        Q.    After you appeared for him?

14        A.    No, a she, Jean Paige Turko.    In

15   that 12, that would have been one of them.

16             For Paige Turko, the bookkeeper

17   called me:   Peter, we received this letter,

18   a thousand dollars.    The question came,

19   should you go fight it or not.    Then the

20   amount disappeared.    And it was whatever

21   additional records the Geltzer office had

22   maybe proved that she had paid everything in

23   full as well.

24        Q.    After it was questioned?

25        A.    Exactly.
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                20

```
 1                    P. Lev

 2         Q.    You were actively handling 9 of

 3   these cases?

 4         A.    Correct.

 5         Q.    And of those you showed, apart

 6   from the Hayward matter, is that when you

 7   considered yourself as having handled those?

 8         A.    Ms. Hayward retained me in that

 9   post Starr & Company world to handle her

10   affairs to clean up, because Ms. Hayward was

11   in the throes, as I said, of tax liens.   So

12   yes.

13         Q.    She was one of the 9 you listed?

14         A.    Yes, that was on the original list

15   from the Geltzer office saying:   Mr. Lev, we

16   know that you're the party that represents

17   her.

18         Q.    Of the original 9 on your list, 4

19   of the claims including Ms. Hayward proved to

20   be erroneous, is that right?

21         A.    That is correct.

22         Q.    Or false?

23         A.    Yes.

24         Q.    You would not oppose the

25   description of the books having been cooked
```



PETER M. LEV, E.A.                                              April 20, 2015
GELTZER vs. TANE                                                           21

```
 1                    P. Lev
 2   as regards to them?
 3        A.    No.    That is still an accurate
 4   statement about what was going on at Starr &
 5   Company.
 6        Q.    Let's turn to the remaining three
 7   of those cooked book cases.
 8             We have one for Paul Guilfoyle.
 9             MR. SOLOVAY:  First, let's mark
10        Ms. Hayward's documents as Exhibit 2.
11             (Defendant's Exhibit 2, Ms.
12        Hayward's documents, marked for
13        identification, as of this date.)
14   BY MR. SOLOVAY:
15        Q.    Turning to your letter, Exhibit 1,
16   tell me about Paul Guilfoyle's case.
17        A.    Paul Guilfoyle, long-time client,
18   Geltzer's office assertion was that it was an
19   outstanding amount of $1,890.   I produced a
20   check in the amount of $1,890 in payment in
21   full of his outstanding balance and that went
22   away, disappeared, no further claim on the
23   part of the Geltzer office.
24        Q.    Did anybody apologize for making a
25   false claim?
```



P. Lev

2    A.    No.    Other than it just produced

3  what it was that I knew that that client

4  would have paid the bill in full.

5    Q.    How did you learn that the claim

6  had gone away?

7    A.    It just disappeared from any

8  further communication of any kind of still

9  outstanding or open amount.   There was no

10  formal letter saying:  Thank you for

11  producing this and we're good to go on it.

12          MR. SOLOVAY:  Please mark the

13  Guilfoyle exhibit.

14          (Defendant's Exhibit 3, Guilfoyle

15      exhibit, marked for identification, as of

16      this date.)

17  BY MR. SOLOVAY:

18    Q.    Anything special about that?

19    A.    No, the $1,890 assertion that

20  there was a balance and producing the $1,890

21  check, and done.

22    Q.    When was it those bills were

23  supposedly covering?

24    A.    This one was an invoice date of

25  April 1, 2010.  Mr. Starr's demise was May of



```
1                    P. Lev

2     2010.  The bill was dated April 10th, Mr.

3     Guilfoyle paid his bill April 19, 2010 by the

4     check he produced.   There was no question

5     this was payment in full of that open

6     invoice.

7          Q.    Going back for a minute to Frances

8     Hayward's bill, what date were those bills,

9     can you tell?

10         A.    There's a top sheet that went with

11    the Frances Hayward bill.

12               The bills were for periods April

13    1, '08, July 1, '08, October 1, '08 showing

14    15,000 each quarter.

15               As I mentioned to you, the 45,000

16    became 30,000, I guess upon further review of

17    the Geltzer records of whatever they had

18    inherited.   But by this period in time in

19    '08, Frances had already run through the bulk

20    of her money.

21         Q.    Those bills were just incorrect,

22    is that right?

23         A.    Absolutely.   There was no

24    reflection made that the base of funds that

25    Starr & Company had invested or were
```



1              P. Lev

2   investing presently at that time -- clearly

3   it should have been a fraction of or almost

4   eliminated at that point.

5              But that's not reflected because

6   it's clear that even the information that I

7   gave relating to when tax liabilities were

8   incurred in the '05, '06, '07 period,

9   Frances, at that point, if she had money, she

10  would have paid these tax bills.   The money

11  was gone of what she had already run through.

12  And that's all here.

13      Q.   Didn't you say it was 6 or 8

14  million?

15      A.   It was $6 million when she came

16  into the firm and she proceeded to spend --

17      Q.   As a matter of full disclosure, I

18  should note for the record that I was the one

19  who had recommended Frances along with

20  several others to Starr?

21      A.   That is correct, Norman.

22      Q.   And later I became the trustee for

23  a trust that was set up for her additionally

24  which she also managed to run through?

25      A.   That is correct, Norman.



PETER M.  LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                  25

1                     P. Lev

2              You clearly know the pattern of

3    her having spent the millions of dollars on

4    the movie.

5         Q.    And as a further matter of full

6    disclosure, I want to note my guilt in this

7    matter.   I was the one who, having settled a

8    case against Ken Starr and his brother in

9    Long Island, made it possible for him to open

10   up his New York office, separate from his

11   brother.

12        A.    Of which I was there at the time.

13        Q.    To my misfortune, in terms of

14   various clients, I became, I would say

15   friends with him and had referred any number

16   of clients to him, as you know.

17        A.    That is correct, Norman.

18        Q.    The next case that you corrected

19   and caused to be withdrawn was Jeffrey

20   Zucker, is that right?

21        A.    That is correct.

22        Q.    I will hand you the Jeffrey Zucker

23   documents.   Do you need the cover letter?

24        A.    The cover letter is from the

25   Geltzer office showing the amount



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 26 of 93

PETER M. LEV, E.A.                                April 20, 2015
GELTZER vs. TANE                                              26

```
 1                    P. Lev
 2    outstanding, and I'll give you the cover
 3    letter and documents.
 4               MR. SOLOVAY:  And ask they be
 5    marked as Exhibit 4.
 6               (Defendant's Exhibit 4, Documents,
 7         marked for identification, as of this
 8         date.)
 9    BY MR. SOLOVAY:
10         Q.   Tell me about this one.
11         A.   Jeff and Karen Zucker, clients of
12    mine, received a bill from Geltzer's office
13    showing an amount outstanding or an alleged
14    amount outstanding of 12,834.63.  I produced
15    cancelled checks in the exact amount of
16    $12,834.63.   There were three monthly bills
17    that were alleged to  have been unpaid.
18    Checks were produced in full.  Matter went
19    away.
20         Q.   Was anything said by the trustee's
21    lawyer?
22         A.   No, other than when I inquired on
23    a subsequent phone call:   What about the
24    information I sent on Mr. Zucker?  What about
25    the information I sent on Mr. Guilfoyle.
```



14-02415-mew    Doc 15-1    Filed 06/04/15    Entered 06/04/15 10:27:44    Exhibit
Transcript of Lev Deposition    Pg 27 of 93

PETER M. LEV, E.A.                                              April 20, 2015
GELTZER vs. TANE                                                          27

```
 1                    P. Lev

 2              "We are done with that."

 3              It was something:   We're done, it

 4    was paid in full.

 5         Q.    There was never in any of your

 6    matters that went away, any acknowledgment by

 7    the trustee's lawyer that they had committed

 8    an error?

 9         A.    Nothing in writing, and nothing

10    that would have said to that effect:  Sorry,

11    thank you.

12         Q.    Would you say they were still

13    covering up their mistakes?

14         A.    Other than I produced the evidence

15    showing that they were paid in full -- again,

16    they're basing things on records that they

17    inherited.

18         Q.    Inherited?

19         A.    They took over.

20         Q.    In discussing it with Mr. Bruh,

21    you had suggested that those records were not

22    reliable at all?

23         A.    That is correct, on a number of

24    occasions I mentioned that.

25         Q.    And had he ever acknowledged that
```



1                     P. Lev

2     to you?

3          A.    No.

4          Q.    Did you ever discuss with him any

5     further steps that he might have taken to

6     check those records?

7          A.    Only in the aftermath of producing

8     the cancelled checks on the clients that I

9     showed 100 percent of the bill having been

10    paid, I again introduced the whole concept of

11    the relying on books and records that they

12    were viewing and reviewing and saying

13    something is not right about those books,

14    that they have to be wrong, where did the

15    money go, that I have now produced these

16    cancelled checks if you are relying on a set

17    of books to be accurate in your attempt to

18    collect funds.

19         Q.    Did you believe that this was the

20    case not only in the four different matters

21    we will discuss where cases were not pursued,

22    did you believe it to be the case in

23    connection with other of the 9 matters that

24    you were dealing with?

25         A.    Yes, based on billing practices



```
1                    P. Lev

2    and the amounts and having had 27 prior

3    years' experience, a number of these people

4    had been in my life 20-plus years.

5         Q.    You, personally are persuaded, if

6    I don't misstate it, that the same errors

7    permeate or may very well and probably

8    permeate all matters that you were handling,

9    is that an accurate statement?

10        A.    I think that is an accurate

11   statement.

12        Q.    Is there any reason to believe

13   that Mr. Bruh was taking this possibility

14   into account in connection with his

15   collection efforts?

16        A.    I think Mr. Bruh was relying on

17   the records that they were reviewing and

18   viewing.

19        Q.    And he paid no attention to your

20   showings that these records were phony?

21        A.    That's a hard -- to answer that

22   comment, the letter that I sent to him which

23   took clients by client information of my

24   involvement of issues that I felt were valid

25   towards making the issue that what we were
```



PETER M.  LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                30

                          P. Lev

1                         P. Lev

2    dealing with were improperly -- I guess the

3    amount outstanding was improperly being asked

4    for, as to why a bill was so high compared to

5    what should have been an annual.

6              So getting back to that answer,

7    it's not as if Mr. Bruh and I had any other

8    discussion.

9              There was never an admission on

10   his part that:   Yes, Peter, you've given us

11   something.

12       Q.    Apart from calling it an admission

13   on his part, would you also say there was

14   never a lesson learned by him from what you

15   were telling him and showing him?

16       A.    I felt I was giving conclusive

17   proof that the bills were improper and not to

18   be relied on.

19       Q.    And he was ignoring that, is that

20   correct, as far as you knew?

21       A.    As far as I know, they were still

22   standing by whatever was on their books and

23   records being accurate, and they would be

24   pursuing remedies on their end to get things

25   paid, to get the outstanding amount paid.



P. Lev

1

2      Q.    The next case which you proved

3  where they were incorrect was Jeffrey Zucker,

4  is that right?

5      A.    We discussed Jeffrey and Karen

6  Zucker, that was the one we just did.

7          The other one was Terry Ellis,

8  that is probably part of the same package.

9      Q.    Exhibit 4 is Jeffrey Zucker.

10     A.    Right.

11     Q.    Is this a duplicate?

12     A.    This letter is April 9, 2014 and

13  this one is September 9, 2013.  Same matter,

14  just different time frames of when the

15  Geltzer office was still looking to collect

16  it as I was trying to get records from the

17  bank to settle it.  It's all the same

18  package.

19          MR. SOLOVAY:  Why don't we mark

20      this second package as Exhibit 4A.  This

21      is another letter dated April 29, 2014

22      from Geltzer over further documents.

23          (Defendant's Exhibit 4A, Letter

24      dated 4/29/14, marked for identification,

25      as of this date.)



```
 1                      P. Lev

 2   BY MR. SOLOVAY:

 3        Q.    There is in this Exhibit 4, a note

 4   from Jeffrey Zucker to you which perhaps we

 5   ought to mark as Exhibit 4B, which says:

 6   Peter, they sent this to my old address so I

 7   just got this --

 8             What does it say?

 9        A.    "Peter, they sent this to my old

10   address so I just got this.   I have no idea

11   who this guy is."

12             MR. SOLOVAY:   Why don't we mark

13        this as Exhibit 4B.

14             THE WITNESS:    He's referring to

15        the Geltzer office, who this guy is.

16             (Defendant's Exhibit 4B, Note from

17        Jeffrey Zucker, marked for

18        identification, as of this date.)

19   BY MR. SOLOVAY:

20        Q.    This is one of the cases that you

21   showed had been paid in full?

22        A.    Absolutely, paid in full.

23        Q.    And the same result, there was no

24   acknowledgment of the mistake by Mr. Bruh but

25   he took no further action once you proved it?
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                              33

                          P. Lev

1

2        A.    That is correct.

3        Q.    No apology, I take it, to anybody?

4        A.    No.

5        Q.    Our next case, Terry Ellis?

6              MR. SOLOVAY:  Mark this as Exhibit

7        5.

8              (Defendant's Exhibit 5, Terry

9        Ellis documents, marked for

10       identification, as of this date.)

11  BY MR. SOLOVAY:

12       Q.    Tell us what happened in that one.

13       A.    Again, a letter arrives, Geltzer

14  office.  It says there is an outstanding

15  balance of $4,639.50.

16             I had Mr. Ellis go back to his

17  private banking team at JP Morgan Chase and

18  we produced checks in the amount of

19  $4,639.50, and that was resolved with, again,

20  no further action on the part of the Geltzer

21  office, paid in full.  And eliminated off

22  the list of open balances due.  Pretty clear

23  on that.

24       Q.    And we have one more to go, the

25  last one where the matter was dismissed?



                              P. Lev

      A.    No.    I think -- is that the Lucky

Pierre?

      Q.    Yes.

            MR. SOLOVAY:  Why don't we mark it

      as the next exhibit.

            (Defendant's Exhibit 6, Lucky

      Pierre documents, marked for

      identification, as of this date.)

BY MR. SOLOVAY:

      A.    The Lucky Pierre, the original

letter was demanding $10,500.  It was then

subsequently updated to an amount outstanding

of $9,000, $1,500 a quarter.

            What I produced in this package

were copies of:  Return, sender attempted,

not known, unable to forward, in each of the

quarterly bills that never made it to the

client.

            So it was addressing -- the whole

sloppiness on the part of the controller's

office, Roseanne Ragano, about their

inability to update records, keep records

current, and receivable in this particular

client's case continued to mount and the



```
 1                    P. Lev

 2   client had moved from New York to California,

 3   and so it being resolved with a payment to

 4   the Geltzer office to settle up this.

 5                    But it was settling up for

 6   something less.  Because, again, I was still

 7   feeling there were billing inaccuracies and

 8   an inability to try to come up with copies of

 9   cancelled checks that go back to a period of

10   '08, '09.  I didn't leave Starr & Company

11   with any accounting records for the most

12   part.  The government kind of took all those

13   records.

14        Q.    So these bills, at least some of

15   them, go back to 2008?

16        A.    Some of them go back even further,

17   in some cases it shows '07.

18        Q.    By that time, the books were

19   questionable to say the least, is that

20   correct?

21        A.    Right.

22                    If I left in May of 2010 and Mr.

23   Starr got arrested in May of 2010, all of

24   this searching for unpaid funds go back to

25   2013.  It wasn't as if this kind of came
```



```
1              P. Lev

2   about early on after Mr. Starr's demise and

3   the collapse of Starr & Company.   It was a

4   few years later.

5        Q.    But by 2008, the financial

6   problems that Starr was dealings with had

7   come about in fairly full force, is that

8   correct?

9        A.    Oh, absolutely, right down to

10  bonuses not being paid, the theft of my money

11  was very clear in the '09 period.

12       Q.    And to the extent that the billing

13  was being cooked as I put it, that cooking

14  would have started in 2008 or earlier?

15       A.    I think it's a fair assumption

16  that the sloppiness --

17       Q.    Overstating, would you say?

18       A.    The answer is yes, I still

19  believed that as Mr. Starr was getting bank

20  financing and loans like any other lending

21  institution would be looking to some of these

22  books and records and receivables and what's

23  on the books, and it was still in somebody's

24  vested interest to keep a number higher as a

25  bank makes their decision.
```



PETER M. LEV, E.A.                                      April 20, 2015
GELTZER vs. TANE                                                     37

```
1                      P. Lev

2        Q.    And he was in trouble by 2008, in

3   financial trouble, would you say?

4        A.    We all believed that to be the

5   case.

6        Q.    This is the last of the bills that

7   were withdrawn?

8        A.    The Lucky Pierre was not

9   withdrawn, we settled for something less.

10       Q.    How much less, a significant

11  reduction?

12       A.    Any monies that I feel that could

13  have been settled for less were quote

14  significant.

15           I think in that case it's

16  something that is made between Mr. Geltzer's

17  office, something got settled for less, by

18  questioning some of what evidence they were

19  providing to me for the bill.

20       Q.    We finally come to Susan Tane's

21  bill, don't we.

22           That, too, was a matter of an

23  incorrect address at one point, wasn't it?

24       A.    That is correct.  I think Susan

25  communicated with me about an improper
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 38 of 93

PETER M. LEV, E.A.                                            April 20, 2015
GELTZER vs. TANE                                                          38

1                    P. Lev

2     address.

3              Susan communicated with me about

4     her intent to withdraw.

5              And all that kind of information,

6     I would walk down the corridor to Roseanne

7     Ragano's office, to Ken Starr's office and

8     say:   Ken, Roseanne, I got this letter from

9     Susan Tane, and Susan is making her

10    intentions known that she wants her monies

11    cashed in from Bear Stearns and sent back to

12    Fiduciary Trust Company where the monies

13    originally came from.

14       Q.    And in 2009, by early 2009, she

15    had fully withdrawn, hadn't she?

16              Let me show you a letter.

17              MR. SOLOVAY:   Let's mark this as

18         Exhibit 7.

19              (Defendant's Exhibit 7, Letter,

20         marked for identification, as of this

21         date.)

22    BY MR. SOLOVAY:

23       A.    What I was just presented with,

24    defendant's Exhibit Number 7, was the letter

25    to the late Alan Greenberg.  Mr. Greenberg



```
 1                   P. Lev
 2    passed away, I guess in the last year.   He
 3    was at Bear Stearns, he was one of the
 4    managing and senior members of Bear Stearns,
 5    and Susan wrote to Alan saying that:   Please
 6    delete Starr & Company, Peter Lev as a
 7    recipient as an interested party.   And that
 8    everything was to be just sent to her
 9    following address up in Westport,
10    Connecticut.
11              But by February of '09, Susan had
12    made her intentions known well before, the
13    year before, that she was an unhappy camper,
14    she wasn't happy with the results.   We had
15    discussed she probably lost somewhere between
16    500,000 and a million dollars, to the best of
17    my recollection.
18              And there was an ongoing -- there
19    was an audit that Starr was handling for a
20    New York State and City resident audit.   She
21    was not pleased at the way it was going, and
22    she made it clear to me that she was hiring
23    another accountant and that she was going to
24    be departing.
25              MR. SOLOVAY:   Let me mark as
```



1                   P. Lev

2        Exhibit 8, a letter from Susan Tane to

3        the accountant that she had retained to

4        do her 2008 taxes and the billing and

5        information relating to that.

6             (Defendant's Exhibit 8, Letter,

7        marked for identification, as of this

8        date.)

9   BY MR. SOLOVAY:

10       A.    In this package is the letter that

11  Susan wrote to me in February of 2008 where

12  she served formal notice that she wants her

13  Bear Stearns investment account and what was

14  called the Susan Jaffe Tane account and the

15  Susan Investment Limited Partnership account

16  back to Fiduciary International, that was

17  February 22, '08.  That letter is in there,

18  that was addressed to me.

19            And then besides that letter from

20  Susan to Thomas Shivers, who I guess became

21  her subsequent accountant dated March 2, '09,

22  Susan wrote a letter to me that's in here

23  dated April 6, 2009 where she is saying:

24  Gee, I haven't been at this address for 15

25  months and she moved in December of '07 and



```
 1                    P. Lev

 2   that she notified my office at least a dozen

 3   times about the address change.   And saying

 4   the lack of attention to her affairs from my

 5   office seems to have been a prevalent theme

 6   throughout the past few years.

 7             I know I had the conversation with

 8   her after.   She says:   When I return from

 9   Florida and you are past the crunch in tax

10   season, I will call you to discuss the Starr

11   & Company bill, copies are in here.

12        Q.    Here's a copy of the bill.

13        A.    It's actually in here, the April

14   1, '09 bill showing the quarter ending

15   3-31-09 for $12,000.

16        Q.    That bill was for services for

17   accounting primarily for 2008?

18        A.    No.   Going back to how clients

19   paid Starr & Company, Mr. Starr and Susan, to

20   me from my recollection, the $12,000 was the

21   quarterly invoice.   12,000 times 4 is

22   $48,000.   I am under the belief that Susan

23   gave between 4.8 and $5 million to Starr &

24   Company to manage.   Therefore, 1 percent of

25   $4.8 million is $48,000, 48,000 divided by
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 42 of 93

PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                    42

1              P. Lev

2      four quarters is $12,000.

3              This bill is dated April 1, '09.

4      By that period of time, she was having her

5      taxes done by another accountant.   Based on

6      the letter of February '08, she was moving

7      out and had moved out the bulk of her monies,

8      maybe a limited partnership took a little

9      longer to unwind.

10             To me, it's very clear that this

11     bill of $12,000 for the first quarter of '09

12     is erroneous.   There was no relationship

13     with Susan.   The relationship was fractured,

14     flawed and it was gone, and Susan had moved

15     on already.

16             Even in this package you gave me,

17     Thomas Shivers is billing her for the '08

18     year, federal, New York State, Connecticut

19     and 709, the gift tax return, $7,000.   But

20     this is a bill from Mr. Shivers to Susan.

21             Why would Starr & Company be

22     billing her other than the books and records

23     of Starr & Company clearly were not

24     reflective of any updates to what was going

25     on with the change in status.



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 43 of 93

PETER M. LEV, E.A.                                             April 20, 2015
GELTZER vs. TANE                                                          43

1                   P. Lev

2        Q.    By February of 2009, she had cut

3    off any communications --

4        A.    Absolutely.

5        Q.    -- before that?  However, as you

6    said, in February of 2008 she had started to

7    withdraw all of her funds, is that correct?

8        A.    Absolutely.

9        Q.    Have we marked this one?

10       A.    In that package is the February 22

11   '08 letter.  That's the letter to me where

12   she is saying:  Peter, this is what I need

13   you and want you to do about moving out the

14   funds from Bear Stearns.

15       Q.    Do you have any idea how much was

16   left after she moved out most of these funds?

17       A.    No.  Bear Stearns was one of the

18   larger positions of the entire folio.  There

19   were a couple of others.  But as we talked

20   about, there was a loss of a half million to

21   a million dollars on one or two of the funds

22   that were there.  So clearly that money

23   disappeared.  This money left to go back to

24   Fiduciary.  By '09, there was nothing left,

25   there was no relationship.



PETER M. LEV, E.A.                                     April 20, 2015
GELTZER vs. TANE                                                    44

1                      P. Lev

2       Q.    By February 2008, the amount that

3   was being charged was erroneous, is that

4   correct, because by then a lot of the

5   funds --

6       A.    The bill that we're dealing with

7   is April of '09.

8       Q.    That's right.

9       A.    Right.    It would cover the

10  quarter previous.    It would cover the

11  quarter ending 3-31-09.    Therefore, January

12  1, '09 to March 31, '09, but you have a

13  letter dated February 22, '08 where she is

14  saying:   We're done, move it out.

15      Q.    So this was basically an incorrect

16  bill in terms of the amounts?

17      A.    I have to believe that to be the

18  case.

19      Q.    It had to be incorrect in terms of

20  how much was moved out?

21      A.    Yes.

22      Q.    And there was a cooked book, in

23  terms of her balance, is that correct?

24      A.     In the use of the term cooked

25  book, it's clearly an improper amount that's



PETER M. LEV, E.A.                                April 20, 2015
GELTZER vs. TANE                                            45

```
 1              P. Lev
 2  on the books not reflective of what would
 3  have been the current situation with Susan or
 4  no dealings with her.
 5       Q.   Have you communicated all of this
 6  to Mr. Bruh?
 7       A.   The answer is yes, as over the
 8  last couple of weeks, I did say to Mark that:
 9  If you're pursuing the Susan Tane open
10  invoice, and he was aware and I'm being
11  deposed to take the oral exam today, I said:
12  I'm going to say what took place.  That Susan
13  was an unhappy person who had left and
14  clearly had sustained losses and had already
15  removed herself as a Starr & Company client.
16       Q.   And despite having removed at
17  least the majority of her funds from Starr in
18  early 2008 they were billing her for services
19  in 2008, is that correct?
20       A.   Well, considering there's not an
21  open bill here, the answer would have to be
22  yes.
23       Q.   Have you any explanation then for
24  why this matter is being pursued?
25       A.   Other than a set of books that the
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 46 of 93

PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                              46

```
 1                    P. Lev
 2    Geltzer office is utilizing, clearly is not
 3    reflective of whatever updates -- that the
 4    books have to be improper based on any kind
 5    of receivable balance that is being asserted
 6    or alleged of an out standing amount.
 7              Starr & Company couldn't even get
 8    her address right about a move that happened
 9    in '07.   And she writes that in the letter.
10    She was not a happy person when she wrote it,
11    and then had a subsequent phone call with me
12    saying:   Peter, can't you guys get anything
13    right?
14         Q.   Had you communicated to Mr. Starr
15    and the bookkeeper that this is wrong?
16         A.   Absolutely, no ifs, ands or buts
17    about that.
18         Q.   You told them she didn't owe that
19    money?
20         A.   I would have said, as Susan was
21    saying, it's an improper billing.
22              But I never would have seen a
23    follow-through by the controller to say:
24    Peter, it's been handled.   You made certain
25    assumptions that the controller, the
```



```
 1                   P. Lev
 2   bookkeeper, the person in charge of the
 3   billing, Mr. Starr was in control of
 4   Roseanne, and that area of the firm, if you
 5   never heard anything from the client, you
 6   assumed it was all good and taken care of.
 7           Clearly there's still something
 8   that was going on.
 9      Q.   Have I missed anything that was
10   discussed in terms of the documents relating
11   to Susan Tane?   I don't think so, let me
12   make sure.
13           We have her surprise at the
14   misaddress.
15      A.   That letter is in there, that is
16   the April 6, 2009 letter.
17           The letter of February 22, '08 is
18   in the package about the letter to me saying:
19   Please remove my investments.
20           The letter dated February 27, '09
21   to the late Alan Greenberg saying:   Just
22   remove Peter Lev as an interested party.
23           And then, of course, the bills
24   from her new accountant, Mr. Shivers, who
25   took care of '08's federal New York State,
```



```
 1                    P. Lev
 2    Connecticut and the gift tax return for that
 3    year.
 4             To me, it's a pretty complete
 5    package.
 6        Q.    Are you aware of any attempts by
 7    people who, like Susan, have lost substantial
 8    funds as a result of the handling of their
 9    funds by Starr, have they made any attempts
10    to retrieve or sue for those lost funds?
11        A.    I'm unaware of that.
12        Q.    Do you think they would be
13    entitled to?
14        A.    Norman, I think when clients, and
15    you know, all the caveats that go into
16    investing, the nature of investing and the
17    potential to lose money, I have to believe
18    that a lot of these folks are pretty savvy
19    about the risk involved.
20        Q.    That is a fair statement.
21        A.    Right.   And I wouldn't venture
22    what remedies they might have of the
23    fiduciary responsibilities that somebody has
24    to invest their money.
25        Q.    I think we have come pretty close
```



PETER M.  LEV, E.A.                                       April 20, 2015
GELTZER vs. TANE                                                      49

```
 1                    P. Lev
 2   to closing our deposition of you.
 3              We'll give Mr. Skiff to ask you
 4   questions as well.
 5              From everything I have been told
 6   by you, I'm planning to report what the
 7   trustee is doing as part of a criminal
 8   enterprise.
 9              MR. SOLOVAY:  Thank you.
10   EXAMINATION BY
11   MR. SKIFF:
12       Q.   Good morning, Mr. Lev.  My name is
13   Gregory Skiff.   I am from the office of
14   Tarter Krinsky Drogin.  My office represents
15   the Chapter 7 Bankruptcy Trustee, the Office
16   of Robert L. Geltzer, in this matter.
17              I have had the benefit of sitting
18   here and hearing your testimony through the
19   questioning of Norman, so I just have a
20   couple of follow-up questions.
21              As Norman noted to you, please try
22   and give an audible response and I won't go
23   through all of those ground rules again.  I'm
24   sure he told you all about them.
25              By way of background, what is it
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                  50

```
 1                    P. Lev
 2   exactly that you do?
 3        A.    I am a business manager.  I'm an
 4   enrolled agent.  I have a Federal Government
 5   license with the Internal Revenue Service,
 6   the U.S. Treasury, to represent taxpayers in
 7   all 50 states.  I have been a business
 8   manager for 30-plus years, including 27 of
 9   those years over at Starr & Company.  I was a
10   managing director, also an employee.  So no
11   equity in the business.
12             I departed in May of 2010, one
13   week before Mr. Starr's arrest, and the
14   demise of Starr & Company.  I opened up my
15   own practice, Peter Lev Business Management.
16   And I represent some of the same folks that I
17   have had the pleasure of representing for
18   25-plus years and proud of it.
19        Q.    Are you an attorney?
20        A.    I am not an attorney.  My enrolled
21   agent license permits me again to practice in
22   front of the Internal Revenue Service on
23   behalf of taxpayers in all 50 states.
24        Q.    You had mentioned that your -- I'm
25   going to split this up.  Let's start with
```



```
 1                    P. Lev

 2    the 401(k).   I heard you mention money was

 3    being stolen from your 401(k)?

 4         A.    Yes.

 5         Q.    Can you tell me a little bit about

 6    that, what happened, when did you notice it,

 7    did it get fixed?

 8         A.    In 2009, I was having -- actually,

 9    for all the years leading up to '09, I had

10    participated in the 401(k) to the maximum.

11    Let's assume $300 a week out of my paycheck

12    was being set aside to max out my 401(k)

13    pension.

14              It was highlighted in '09 that as

15    we would get -- I did reference that all of

16    the 401(k) money at Starr & Company were the

17    employee's funds.   There was no Starr &

18    Company matching, there was nothing by Mr.

19    Starr put in on top of what was your funds.

20              So an interesting thing started to

21    develop in '09 where you would see a timing

22    difference.   $300 a week times the 13 weeks

23    in a quarter, $3,900 was being taken out of

24    your paycheck and you would get your

25    quarterly statement and you would see that
```



P. Lev

1

2  not all those funds had made it into your

3  401(k) balance report.

4        So questions were asked, the

5  comment was:   We were just a little bit late

6  in getting those funds in.

7        By the end of '09, the funds

8  weren't getting in, even on a late basis.

9  They never made it into the 401(k).  So on

10  the date of my departure, which was May 21,

11  2010, a Friday because I opened up an office

12  on May 24, 2010 on a Monday, and Mr. Starr

13  was arrested on Thursday, May 27, 2010, which

14  was leading up to Memorial Day Weekend, the

15  amount of loss in that 401(k) probably

16  approached at that point on the date of my

17  departure 6 to $7,000 of the 25,000 that I

18  lost and was a victim of from Mr. Starr.

19     Q.   6 to 7 of 25, you said?

20     A.   Probably closer to $7,000.   Plus

21  -- not that you can count it, but the stock

22  market had been doing well and clearly there

23  was growth that would have happened had that

24  money gone to where it was supposed to, which

25  it didn't.



PETER M. LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                        53

```
 1                      P. Lev

 2      Q.    Did you ever make a claim to

 3  recover that money?

 4      A.    I had thought that I had filed

 5  along with everyone else, and I did ask Mark

 6  Bruh about it, he said your name was not on

 7  any list.

 8            As I did say, Gregory, my last

 9  paycheck bounced, that was pretty clear

10  because the entire firm of everybody who was

11  still there even on the day of Mr. Starr's

12  arrest, their paychecks bounced.

13            So it was that paycheck, it was

14  the 401(k), and then there was a significant

15  amount of unreimbursed business expenses that

16  I incurred and submitted bills for that never

17  got paid.

18            So again, to answer your question

19  did I file a claim?   I thought I had filed

20  what I needed to as part of ultimately what

21  became the Starr & Company, et al.,

22  bankruptcy filings.

23      Q.    Did you have an attorney to help

24  you with that?

25      A.    No.   Did it on my own.   Maybe
```



PETER M. LEV, E.A.                                April 20, 2015
GELTZER vs. TANE                                            54

```
 1                  P. Lev
 2   that was a mistake.   I thought I had been
 3   advised there were certain protections built
 4   into that, in the primary position, if there
 5   was a paycheck you go even above a secured
 6   creditor, but I could be wrong because I
 7   don't expect to see the money.   It would
 8   certainly be very nice to think that some day
 9   I would.
10       Q.    You mentioned that there were a
11   number of discrepancies on the bills.
12            Was this something that happened
13   throughout your 27 years at Starr & Company?
14       A.    I think it's fair to say that in
15   the time frame that Roseanne Ragano was the
16   controller at Starr and she was the
17   controller for a number of years, we all --
18   when I say we all, the other managing
19   directors -- there was an open discussion
20   about how sloppy the books and records were
21   and the lack of attention.   Bills would get
22   out late.   This was a regular recurring
23   theme.
24            MR. SOLOVAY:  Did you tell the
25        time which she took over?
```



                          P. Lev

         A.    The firm fell apart in 2010.   My

best guess is she had to have been there for

at least a decade.   Because there was a

woman name Frances Cutrone who was the

controller prior to Roseanne coming in, but

Roseanne had her finger on the pulse with

everything that had to do financially with

Starr & Company.

         Q.    You mentioned there was an issue

with addresses not being updated, is that

right?

         A.    That is correct.

         Q.    You also mentioned a discrepancy

as to amounts.   You mentioned something

about a formula, 1 percent of all the monies

being invested?

         A.    That was one way.

               Starr & Company as a business

management firm, we handled a number of folks

in the entertainment industry.   In certain

clients cases we billed 5 percent of their

gross annual income.   And there was some

folks, who were very well known names who the

billing was in the hundreds of thousands of



                              P. Lev

1    dollars per year for their client accounts.

2            In other cases, as Mr. Starr

3    branched out into the investment advisory

4    realm, and again, he set up the company Starr

5    investment advisors and the SEC was coming in

6    to do their due diligence, the billing on

7    that was typically the 1 percent of -- if a

8    client put in $50 million Mr. Starr would get

9    1 percent of that as the fee.   And there

10   were clients who gave Starr & Company that

11   kind of amount.

12        Q.   That was split up into quarters,

13   correct?

14        A.   That is correct.

15        Q.   Other than the addresses and other

16   than amounts you say should have been

17   adjusted for a reduction in the amount of

18   investment funds being used by Starr &

19   Company on behalf of the clients, were there

20   any other discrepancies with the bills?

21        A.   Yes, Gregory.

22            I think I highlighted that.

23   There were times where a client would have

24   said that they paid a bill but the billing



```
 1                    P. Lev
 2    that they received for the quarter was not
 3    reflective of an amount that might have been
 4    paid by them.
 5              And again, whether they got
 6    corrected and my assumption is those type of
 7    problems that were highlighted would have
 8    been corrected as things were going along, on
 9    the date that Mr. Starr was arrested and the
10    firm was shut down by the government, and
11    inheriting -- I use that words inheriting --
12    the books having been turned over to the
13    proper receiving parties to review it, I
14    can't tell you how long any discrepancy might
15    have still been sitting out on a book,
16    because there was nobody there to advocate
17    for a client to say:   You guys didn't
18    correct it.   I'm getting the phone call.
19         Q.   I understand.
20              Do you have any reason to believe
21    that any amounts on any bills were just made
22    up?
23         A.   I highlighted to Mark Bruh in a
24    couple of clients cases that are on that,
25    specifically Harriet Lane and Ken and Nancy
```



1                        P. Lev

2    Lane the amount of the bill was so high and

3    doesn't it seem really odd that in the March

4    2010 period and April 2010 period, in the

5    couple of months leading up to the collapse

6    of the firm as he was bleeding money, that

7    all of a sudden you got a person receiving a

8    $3,700 combined bill for what was essentially

9    an easy W-2/1099 type tax return where the

10   average bill for this type of person would

11   have been a thousand dollars, all of a sudden

12   there's $3,500 worth of billable time and

13   billings coming out of the combination tax

14   department, because we all kept time sheets.

15            But I don't think there was any

16   way other than the controller taking time

17   sheets and doing whatever they did and

18   creating computer charges.

19            So yes, I was very vocal to Mark

20   about that.  It seems strange that those kind

21   of bills would be rendered in those couple of

22   months leading up to -- as he was definitely

23   incurring, meaning Mr. Starr was very much in

24   the throes of financial distress.  We all

25   knew it.



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 59 of 93

PETER M. LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                      59

1                    P. Lev

2       Q.    Other than what you think or

3   speculate what may have happened, do you have

4   any firsthand knowledge of someone

5   intentionally inflating a bill or sending out

6   an invoice for a bill for work that was never

7   done?

8              MR. SOLOVAY:  Are you talking

9        about other than those items that he has

10        testified specifically about?

11       Q.    It could be those or any others

12   that you're aware of from your time there?

13       A.    I wouldn't have any other

14   knowledge.

15              Ones that a client would call me

16   on, and obviously in this aftermath of bills

17   or assertions or alleged amounts outstanding,

18   obviously I'm the one who had to receive the

19   phone calls or have the conversation with Ken

20   or Nancy Lane or Harriet Lane:   Peter, I

21   never saw those bills.  Peter, you are my

22   guy, you know what I was paying the bills for

23   30 years previous, why would there be a

24   $3,500 bill.

25              That's where my comments lied.



PETER M.  LEV, E.A.                                                              April 20, 2015
GELTZER vs. TANE                                                                          60

```
 1                    P. Lev
 2   Not on anybody else that I would not have
 3   handled.
 4            Getting back to Susan Tane for a
 5   moment, I handled her account as the business
 6   manager so I would have intimate knowledge of
 7   what she was paying and even at the time of
 8   departure and when the relationship got
 9   fractured and was over.
10       Q.    I'll get to her in a minute.
11            With respect to your
12   communications with Mr. Bruh, you mentioned
13   there are some claims that he made or drafted
14   letters to Starr & Company's clients saying
15   there were out standing balances.   Then they
16   contacted you to help them, as you put it, to
17   clean up the mess, is that right?
18       A.    I was clearly the party of record
19   of where the Geltzer office went to send the
20   original letters of:   We are the trustees,
21   we are here -- here is this open amount.   So
22   it was then up to me to reach out, and Mark
23   was the contact and has been the contact all
24   along through this process.
25       Q.    You mentioned that there were some
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                   61

```
 1                    P. Lev
 2   matters, I think they're in this June 10th
 3   letter here, Defendants' Exhibit 1, where you
 4   provided some documentation, some evidence to
 5   Mr. Bruh contesting the alleged amounts owed?
 6        A.    That is correct.
 7        Q.    And then he dropped those amounts?
 8        A.    That is correct.
 9        Q.    Were there anywhere you presented
10   evidence to Mr. Bruh and he didn't drop the
11   amounts?
12        A.    There was no case on the ones that
13   are still left to be resolved where the
14   Geltzer office, Mr. Bruh specifically, that
15   they adjusted the bill and we settled on
16   something that would be less than the 100
17   cents on the dollar.
18        Q.    I want to make sure I understand
19   your response.
20            For any amounts --
21        A.    Where I could not produce --
22        Q.    -- you could not produce, those
23   amounts stayed the same or were adjusted
24   based on settlement discussions, is that
25   right?
```



PETER M. LEV, E.A.                                                 April 20, 2015
GELTZER vs. TANE                                                            62

```
 1                      P. Lev
 2        A.    That is correct.
 3              MR. SOLOVAY:  You said stay the
 4        same.
 5              He said stay the same, is that
 6        true.
 7              THE WITNESS:    No, in the back
 8        and forth between Mark and myself and the
 9        Geltzer office and myself, I thought I
10        introduced enough in the way of doubt
11        that the amounts were correct as stated,
12        that the Geltzer office came back with a
13        proposed settlement and it was a
14        settlement that was acceptable to my
15        clients in the interest of keeping
16        expenses and anything else going forward
17        to resolve these matters and put this
18        chapter behind.
19              I think that is a more clear
20        statement.
21        Q.    You handled the Tane account?
22        A.    I did.
23        Q.    You said there is a letter that
24   came to you on February 22, 2008 that said
25   she wanted to move her funds from the Bear
```



                            P. Lev

 1
 2   Stearns position back into --

 3        A.    Fiduciary which is where the

 4   monies originally came from.

 5        Q.    And did you handle that transfer?

 6        A.    Absolutely.

 7        Q.    When did that happen?

 8        A.    Immediately thereafter.  When you

 9   get a letter like that and you're dealing

10   with a client's money, rest assured if you

11   are not going to be proactive about the

12   client's request, you're going to hear about

13   it again, and at that point -- I'm sure if I

14   received that letter a couple of days after

15   that letter is dated, the phone call was made

16   to Alan Greenberg's office, the letter was

17   walked into Ken Starr's office, given to

18   Roseanne and everybody would have known.

19             And I am pretty confident that

20   Susan within days was satisfied that whatever

21   she needed to happen and asked for, did

22   happen.

23        Q.    So when the monies were moved from

24   Bear Stearns to Fiduciary, did that somehow

25   take Starr & Company out of the picture?



PETER M. LEV, E.A.                                        April 20, 2015
GELTZER vs. TANE                                                      64

```
1                      P. Lev

2         A.    Absolutely.

3         Q.    How?

4         A.    Because we would have been the

5    party to place her with Alan Greenberg and

6    the Bear Stearns people.   That would have

7    been under "that umbrella" of Mr. Starr

8    managing the money for Susan.

9              So once the monies would have left

10   Bear Stearns and was returned to Fiduciary,

11   Starr & Company would have ceased to have had

12   any kind of responsibility for that.

13        Q.    And I think you said somewhere

14   around 4.8 million she had invested?

15        A.    Which makes sense because 4.8

16   million, 1 percent is $48,000.   48,000

17   divided by 4 quarters is $12,000 a quarter.

18              And that was the bill that is in

19   question.   That number didn't arrive at by

20   any kind of magical formula other than that 1

21   percent.

22        Q.    Do you know if she was billed that

23   12,000 for all the quarters in 2008?

24        A.    It would be tough to say yes since

25   we're only dealing with the one quarter that
```



```
 1               P. Lev
 2   is open, whether Susan paid those bills.
 3   Again, maybe Norman knows, you're asking me
 4   the question.
 5            No, I don't know if that it was
 6   billing for the quarters.   I have to think
 7   that the answer probably is yes.   But I
 8   wouldn't know for a fact.
 9       Q.   You don't know if she received
10   quarterly bills after that February 22nd
11   letter straight up until the bill in question
12   here which is the April 2009 invoice, you're
13   not sure?
14       A.    That is correct.
15       Q.    Did Ms. Tane ever contact you and
16   say:   Why am I still getting bills?
17       A.    Absolutely.
18            MR. SOLOVAY:   You have an exhibit
19       to that effect.
20       A.    Absolutely.   Susan is a very up
21   front, very vocal person.   When there is
22   something not right, you hear from Susan.
23       Q.    When was that, when did she
24   contact you about that?
25       A.    There would have been periods of
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 66 of 93

PETER M.  LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                66

```
 1                    P. Lev
 2  time probably through '08 into '09.
 3            I knew that she was unhappy with
 4  the tax work that Starr & Company was doing.
 5  I knew she was unhappy with the investment
 6  results.  Everything was pushing Susan out
 7  the door.
 8            MR. SOLOVAY:  I think this is a
 9        letter that is part of this, April 6,
10        2009, which is an answer to your
11        question.
12        A.    There is the bill from her new
13  accountant for '08's taxes.  So clearly
14  Starr & Company didn't do any work in '08.
15  She used her new accountant to do it.  And
16  if there is a letter going back to February
17  '08 saying:  Move out my monies, the process
18  should have been complete.
19        Q.    Did the $12,000 she paid cover the
20  accounting services as well?
21        A.    Yes.
22        Q.    So it was both the accounting and
23  investment advisory services that were
24  covered under that 1 percent fee?
25        A.    Yes, and that would have been
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 67 of 93

PETER M. LEV, E.A.                                        April 20, 2015
GELTZER vs. TANE                                                        67

```
 1                      P. Lev

 2    typical.   It wasn't atypical.   That was

 3    typical, not that anything gets thrown in for

 4    free, it was all part of the package, I

 5    guess.

 6         Q.    The $12,000 in Ms. Tane's case, I

 7    think it was 15,000 --

 8         A.    In the Frances Hayward case.

 9         Q.    That amount, you said, should have

10    been adjusted as the money increased or

11    dissipated?

12         A.    It never increased.   It

13    disappeared.

14         Q.    I'll strike my previous question

15    to the extent it was a question.

16              After Mr. Starr started his

17    investment advisory business and adopted this

18    1 percent billing rate, I'll call it that for

19    now, was that the practice that on a

20    quarterly basis they would look and see how

21    much was being invested and to the extent

22    that number was down they would readjust it?

23         A.    That's the way it should have

24    worked, absolutely.

25         Q.    Not the way it should have, is it
```



14-02415-mew    Doc 15-1    Filed 06/04/15    Entered 06/04/15 10:27:44    Exhibit
Transcript of Lev Deposition    Pg 68 of 93

PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                68

```
 1                     P. Lev
 2    the way it worked?
 3         A.    The billing should have been
 4    reflective -- in Frances Hayward's case, if
 5    Frances ran through 5 million of the 6
 6    million you should not be using the $6
 7    million base anymore when the person
 8    basically only has a million or half a
 9    million.
10              The answer is yes.    It should
11    have been adjusted downward.
12         Q.    And you know that that is what
13    they did.
14              MR. SOLOVAY:    Should have done, he
15    said.
16         A.    Should have.
17         Q.    That's not what I'm asking.    I
18    want to be very clear here.
19              With respect to all of Starr
20    Investment Advisors, LLC --
21         A.    Yes, that is one entity and Starr
22    & Company LLC.
23         Q.    With respect to Starr Investment
24    Advisors, with all of their clients who were
25    on this 1 percent fee, was that fee ever
```



```
 1                   P. Lev
 2   adjusted after their initial retention?
 3        A.    I think you're asking a question,
 4   Gregory, of clients that I was responsible
 5   for you would have seen the billing.   And if
 6   there was a challenge by a client that
 7   something -- we didn't get advance ability to
 8   see a bill that would have gone out for a
 9   quarter.   You would have heard about the
10   client's anger or their questioning of:   Why
11   am I still getting a bill for this amount.
12        Q.    That's what I'm asking.
13             Is that the only way the bill got
14   adjusted, is if the client complained that it
15   should have been adjusted?
16             MR. SOLOVAY:   I object to the form
17        of that question.   That's not what he
18        was talking about.
19             MR. SKIFF:   I think he just
20        testified.
21             MR. SOLOVAY:   When he found out.
22        He is also clear the bills were supposed
23        to have been and as far as he knew were
24        adjusted as things went along.
25        A.    We did updated financial
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 70 of 93

PETER M. LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                        70

```
 1                    P. Lev

 2   statements.   Since you submitted those

 3   financial statements to Mr. Starr's office

 4   and Mr. Starr controlled Roseanne Ragano, the

 5   controller, I think it's pretty clear that

 6   Roseanne should have had a different base

 7   with which to work with.   If the base was X

 8   minus X number of million dollars those new

 9   bills would go out.

10        Q.   I agree with you that makes sense

11   and that would seem to be what a fair billing

12   practice would be.

13             What I'm trying to understand is:

14   Is that the billing practice at Starr

15   Investment, was that the billing practice at

16   Starr Investment Advisors?

17             What I'm hearing is:   That may

18   have been fair, that may have been the way to

19   do it but in practice that is not what was

20   done.

21             MR. SOLOVAY:  You're not hearing

22        that correctly.

23             What I'm saying is that what the

24        trustee is doing now is criminal

25        enterprise because what should have been
```



PETER M. LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                        71

```
 1                    P. Lev

 2         done was so clearly required as a matter

 3         of law that their ignoring it is

 4         virtually criminal, and I mean that.

 5              And I am going to be making that

 6         pitch to the judge in connection with my

 7         fee application.

 8         Q.    Let me just ask this question

 9    again:   Were the 1 percent fees charged to

10    clients using Starr Investment Advisors for

11    investment advisement work ever adjusted

12    outside of a complaint from the client?

13              MR. SOLOVAY:   I object to the

14         form.   How can he possibly know, he said

15         he doesn't know.

16              MR. SKIFF:   He sat here and

17         testified today about billing practices,

18         walking down the hallway to Roseanne

19         Ragano.   I think it's a fair question.

20         Q.    Was the fee, in Ms. Tane's case, a

21    $12,000 case, and in any other client case,

22    whatever that 1 percent, was that ever

23    adjusted outside of a complaint from the

24    client?

25         A.    I would not know.   In any case of
```



                          P. Lev
 1
 2    a client that I was responsible for that
 3    would have had a base that was less than what
 4    they started and a client complained, I would
 5    have gone in there as the client's advocate
 6    knowing that I'm the business manager of
 7    record and would have said:    This needs to
 8    be adjusted.
 9            I know that they then got
10    adjusted.
11            But you're asking a question about
12    other clients and other folks, whether that
13    would have happened.   I can't speak for that
14    because there were other business managers
15    such as myself, managing directors, who were
16    responsible.
17            Whether they walked in, too, I'm
18    aware we all knew, again I will still stand
19    by the statement:  The billing was sloppy and
20    that there were a lot of problems that came
21    out of the controller's office for late
22    billing, for not timely, for incorrect,
23    improper.   And I will still stand by that.
24        Q.    If a client retains Starr
25    Investment Advisors and let's say their



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 73 of 93

PETER M. LEV, E.A.                                April 20, 2015
GELTZER vs. TANE                                              73

1                    P. Lev

2    quarterly bill was $15,000, like with Ms.

3    Hayward, and they never complained about the

4    bill being adjusted --

5         A.    I wouldn't know that.  Anybody,

6    again, I would have been responsible for,

7    since I did current financial statements, I

8    would know that somebody's bill was

9    improperly being calculated.

10              You're asking something different,

11   Gregory, about the firm in general.  I can't

12   speak for that.

13              In Susan's case she was my client,

14   so clearly I am aware of the losses she

15   incurred.  I'm aware of what her wishes were

16   about the departure of her monies and even of

17   her tax work.  I can't speak for other folks

18   and about those practices.

19        Q.    Did Ms. Tane ever complain to you

20   about a bill in April of 2008?

21        A.    Ms. Tane complained about a lot of

22   things that related to Starr and her

23   unhappiness.

24        Q.    I'm asking specifically did she

25   ever complain about receiving a bill in April



PETER M.  LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                              74

```
 1                     P. Lev
 2    2008, which would have been after the
 3    February 22nd letter to you that she wanted
 4    the money moved from Bear Stearns to
 5    Fiduciary, did she ever complain in April
 6    2008, if you recall?
 7         A.    Gregory, I'm just thinking back,
 8    she certainly was vocal when the address was
 9    messed up.
10           I do not recall any conversation
11    about that kind of complaint, about a bill
12    being improperly rendered.
13         Q.    What about July 2008?
14         A.    Once again, if it wasn't on the
15    list -- Susan, in essence, was no longer a
16    client that was even being managed by myself.
17    Whether she felt the need or the desire to
18    pay a bill or whatever, that was between her
19    and Mr. Starr.
20           But I would recall, Susan would
21    have put something in writing probably as
22    well.
23         Q.    What I'm trying to understand is,
24    you testified generally that she called to
25    complain about a lot of things with Starr?
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 75 of 93

PETER M. LEV, E.A.                                      April 20, 2015
GELTZER vs. TANE                                                   75

```
 1                    P. Lev

 2        A.    Yes.

 3        Q.    Did those complaints stop in

 4   February of 2008?

 5        A.    It wasn't February 2008.   It was

 6   already by '09 because she wrote a letter in

 7   '09 to me saying:   Peter, I moved in

 8   December of '07 and you guys haven't even

 9   properly --

10             MR. SOLOVAY:  Let me refresh your

11        recollection by giving you a memo from

12        Susan which perhaps we should mark as

13        Exhibit 9.

14             (Defendant's Exhibit 9, Memo,

15        marked for identification, as of this

16        date.)

17   BY MR. SOLOVAY:

18        A.    She is referring to that March '09

19   bill with this memo to you.

20        Q.    Looking at that E-mail that has

21   been presented to you as Defendants' Exhibit

22   9, Ms. Tane seems to suggest here that she

23   was still receiving services from Starr &

24   Company up until the beginning of 2009?

25        A.    Let me read that again.
```



1                   P. Lev

2                   "I was out of Starr & Company by

3          the beginning of '09," and whatever the

4          definition of out of Starr is, meaning funds,

5          any kind of work.   "They didn't do any work

6          for me because I had to scramble around to

7          find someone to do my taxes" which clearly

8          was doing her '08 taxes in '09, and Mr.

9          Shivers bills were there.

10                  Then she is saying she doesn't owe

11         this bill for the first quarter.

12                  So not knowing in Susan's head,

13         the thought is that she may very well have

14         paid those quarterly bills thinking she was

15         going to have the tax work done by Starr &

16         Company in '08 which would account for why no

17         '08 bills are open.

18                  But she was very clear in her

19         wording, "I was out of Starr & Company" and

20         we're only talking about that first quarter

21         of '09 bill.   She is saying:  I had no money

22         there, I had no tax work there, therefore

23         this bill should not even be asserted that I

24         owe it.

25         Q.   Here is what I'm trying to get to:



                        P. Lev

1

2              If the money was moved from Bear

3    Stearns to Fiduciary --

4         A.    That is only one part of what

5    money she invested.  That is not where that

6    500,000 to million dollar loss is.  There

7    were a couple of other funds she put in.

8    That Bear Stearns portfolio was a liquid

9    portfolio of blue chip stocks.

10             That is not where the losses was

11   incurred.  That was her first salvo, her

12   moving away from Starr and just having

13   nothing do with us.

14        Q.    How much do you think was left

15   after she moved that money?

16        A.    A significantly smaller portion

17   than what originally came into the firm.

18        Q.    We can get a range.

19             Between 500,000 and a million?

20        A.    I have to believe that the funds

21   that had to be unwound and might not have

22   been able -- even though it may have been her

23   wishes earlier in the year as you know about

24   certain funds, a fund has the ability to

25   withdraw on a quarter or an end of the year.



1              P. Lev

2              And it is possible, speculation on

3    my part, that the withdrawal notice of

4    whatever might have been left through the

5    course of '08 would have been completed,

6    let's say, at December 31st, '08 for the end

7    of year.

8              That's where again billing should

9    potentially or theoretically have been cut

10   off that would then say:   Gee, why is there

11   a first quarter of '09.   They are not doing

12   my taxes and all my money is gone from Starr

13   & Company.

14             MR. SKIFF:   No further questions.

15   FURTHER EXAMINATION

16   BY MR. SOLOVAY:

17        Q.   When was the investment advisory

18   service started?

19        A.   Mr. Starr applied for Starr

20   investment advisors, again I have to believe,

21   we moved to 850 Third Avenue.

22        Q.   Which was when?

23        A.   I think it was '04-'05 period.

24   There was a client that he was taking on that

25   said:   I'm not giving you -- it was an



```
1                    P. Lev
2   unheard of amount, an ungodly sum of money,
3   he was a Wall Street person who said:    I
4   can't use your firm unless you're a
5   registered investment advisor which caused
6   Mr. Starr to go out and file the application
7   with his son Ron who was the compliance
8   officer, Ron is a lawyer at Proskauer Rose.
9   The filing was done, with the SEC.
10            It's not a matter of if the SEC
11  will investigate you and do their due
12  diligence.   It's when they will.   The SEC
13  took up three or four months in our
14  conference rooms in '09 as they were
15  investigating the pending license for Starr
16  Investment Advisors.
17            Again, going back to the question:
18  I have to believe that it might have been up
19  to two years before that so it could have
20  been in '07 that Mr. Starr applied for the
21  investment advisor, we were all given cards
22  in addition to our Starr & Company LLC cards.
23            I never gave a single person that
24  card of Starr Investment Advisors.
25       Q.    And when did the financial crunch
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                                    80

```
 1                    P. Lev
 2   that you were describing first become
 3   particularly notable or noticeable?
 4        A.   I think it was in '08 and I think
 5   in '09 it ramped up because that is when
 6   monies were being stolen.   Clients were
 7   leaving through the course of '09.   Arnie
 8   Herman, one of my other managing directors
 9   departed with well over a million dollars
10   worth of business in January of 2010.
11             The firm was in absolute free
12   fall.
13        Q.   By 2008, it was clear to you, it's
14   clear to you in retrospect, that the
15   financial problems had already --
16        A.   They were deeply rooted.
17             Again, going back to the markets
18   collapsing, I pointed this out earlier, if
19   Bear Stearns collapsed in March, I believe
20   March or April of '08, Lehman Brothers was
21   September of '08, the throes of the deep
22   financial crisis, of whether Morgan Stanley
23   was going to be in business, it was Rosh
24   Hashanah that year, clients were -- clearly
25   their balance sheets were not showing any
```



PETER M. LEV, E.A.                                    April 20, 2015
GELTZER vs. TANE                                              81

```
 1                    P. Lev
 2   growth through that entire '08 period.
 3           There were breathtaking losses
 4   happening and haircuts being taken in
 5   portfolios.
 6       Q.   Is it fair to say that there was a
 7   qualitative difference as far as you were
 8   concerned in '08 from the kind of errors or
 9   sloppy bookkeeping that may have occurred
10   before then?
11       A.   I know the date Mr. Starr went out
12   and got his credit facilities with Citi
13   National Bank and some of the others that
14   were well documented.
15       Q.   That is when the need to cook the
16   books, if I may call it that, would have
17   occurred, assuming my description is correct?
18       A.   He had a vested interest to keep
19   something at a much higher level and not
20   write down more.  Again, I address that in
21   that letter to Mark.
22       Q.   That need to keep the books
23   looking high would have started by 2008?
24       A.   I have to believe that that is a
25   correct time frame.
```



```
 1                    P. Lev
 2        Q.    If the books were cooked the
 3   cooking would have started by 2008 at some
 4   point; is that a fair statement?
 5        A.    Yes.    That is correct.
 6   FURTHER EXAMINATION
 7   BY MR. SKIFF:
 8        Q.    Do you have any personal knowledge
 9   of anybody fraudulently, as Mr. Solovay has
10   used the term, cooking the books, do you have
11   personal knowledge, have you ever witnessed,
12   did you ever see anyone prepare a fraudulent
13   bill?
14        A.    Other than a client calling and
15   saying that the bill is incorrect, I don't
16   know if they would have used the word
17   fraudulent, I think they would have said:
18   Something is not right Peter and you need to
19   deal with it.
20        Q.    And in each case that a bill
21   wasn't right and it was brought to your
22   attention, you testified that you would make
23   it known to the controller, Roseanne Ragano?
24             MR. SOLOVAY:   I object to the
25        form.
```



P. Lev

He has testified to events that
took place after the bankruptcy
proceedings.   He is not testifying to
events that took place prior to that.
He said yes, he went to correct the bill
for Susan Tane.

MR. SKIFF:  Didn't you just ask
him about 2008?

MR. SOLOVAY:  That is when it
became clear in retrospect to him that
the books had been cooked or probably
have been cooked.

Q.    At the time, in 2008, you were not
aware of anybody "cooking the books"?

THE WITNESS:    I think the way
Gregory is posing that, it's a correct
statement.

A.    The good times of clients coming
in had stopped and clients were exiting at
that point.

That's where I think a lot of the
financial distress was happening, that some
of the better paying clients were departing
along with their friends and -- that's all



```
 1                    P. Lev
 2   documented, I guess, in somebody looking at
 3   receivables of client X being on the books in
 4   '07 and gone by '08 and more gone in '09 and
 5   2010.   The free-for-all of the mass exodus.
 6              MR. SOLOVAY:  Clients like Susan
 7         Tane?
 8              THE WITNESS:   Absolutely, good
 9         and very well paying clients, that was
10         the backbone of Starr & Company and I was
11         there all those years.
12         Q.   Just so that we're clear, your
13   suspicion that the books were cooked in 2008
14   is based on your review of documents after
15   the closure of Starr & Company?
16              MR. SOLOVAY:  That is not what he
17         has testified to.
18              MR. SKIFF:  He can answer.
19         Q.   "Yes" or "no"?
20         A.    In retrospect, again, if a client
21   had a problem with a bill in that time frame
22   that something was improper, and I would have
23   had to have sought out the controller or Mr.
24   Starr and say:   "Ken, Roseanne, a bill is
25   wrong," clearly something obviously would
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 85 of 93

PETER M. LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                        85

```
 1                     P. Lev

 2    have happened in that department to have

 3    fixed the bill and kept the client happy.

 4             If Mr. Starr had to write off

 5    something to quote keep a clients happy, the

 6    assumption is that it did happen.

 7             Going back to your comment about

 8    whether I knew, we were not privy to see the

 9    Starr & Company books.   Not a single

10    managing director had the ability to look and

11    see what somebody's gross billing of the firm

12    was.

13             So we wouldn't know what kind of

14    financial statements he was presenting.

15    It's only -- I want to be clear -- only in a

16    case where I would have the knowledge because

17    I was the managing director of that

18    particular -- and the business manager -- of

19    that group of clients could I have gone and

20    said:   There's something wrong here, it

21    needs to be fixed.

22             And the assumption was it was

23    fixed because then the client was kept.   And

24    in a number of cases the clients went with me

25    in the future, in my post world of Starr &
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 86 of 93

PETER M. LEV, E.A.                                        April 20, 2015
GELTZER vs. TANE                                                      86

```
 1                  P. Lev

 2    Company which was Peter Lev business

 3    management.

 4              MR. SKIFF:  No further questions.

 5    FURTHER EXAMINATION

 6    BY MR. SOLOVAY:

 7         Q.    Is it true that you tried to get

 8    the books fixed, corrected, as far as Susan

 9    Tane was concerned?

10         A.    I think that is a very fair

11    assumption.  That if Susan had an issue like

12    she pointed out in that letter that the

13    address was wrong, I would have gone in with

14    something that showed:  Here is Susan's

15    address in Connecticut.

16         Q.    So you did go back and complain

17    about Susan Tane's bill to Ken Starr and/or

18    the bookkeeper?

19         A.    Susan Tane's bill, if Susan had

20    that problem.

21              That period of time in her writing

22    -- remember, I don't think Susan knew --

23         Q.    That she was being billed?

24         A.    That she was being billed for

25    that.
```



```
 1                    P. Lev

 2       Q.    Not until after she got the bill?

 3       A.    Right.

 4       Q.    And she was gone by that time?

 5       A.    If that quarterly billing has

 6  become a problem, Susan might not have seen

 7  that bill until years later.

 8       Q.    And she didn't?

 9       A.    She didn't because of the improper

10  address issue.  So therefore it wasn't like

11  she would have ever asked me:  Peter, I got

12  this bill wrong.  Because she didn't see the

13  bill.  And then she has produced her

14  evidence saying:  I was already done with

15  Starr & Company by the timing of this first

16  quarter of '09 bill.

17       Q.    As far as the other bills that you

18  have since corrected with Mr. Bruh, those

19  were not matters that you knew about to take

20  up back then?

21       A.    Correct.  None of these that the

22  Geltzer firm sought out after would have been

23  something left hanging back in '08, '09, '10.

24            These are all after the fact.

25            MR. SOLOVAY:  Thank you.
```



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 88 of 93

PETER M.  LEV, E.A.                                          April 20, 2015
GELTZER vs. TANE                                                         88

1              P. Lev

2         THE WITNESS:    If there was a

3     problem with any of those it would have

4     been dealt with back then as part of the

5     client relationship.

6         (Time noted:   12:30 p.m.)

7

8

9              _____

10

11

12  Subscribed and sworn to

13  before me this _____day

14  of _____2015.

15  _____

16      Notary Public

17

18

19

20

21

22

23

24

25



14-02415-mew   Doc 15-1   Filed 06/04/15   Entered 06/04/15 10:27:44   Exhibit
Transcript of Lev Deposition   Pg 89 of 93

PETER M. LEV, E.A.                                              April 20, 2015
GELTZER vs. TANE                                                            89

```
1

2                   I N D E X

3    WITNESS            EXAMINATION BY          PAGE

4    PETER M. LEV, E.A.

5                     MR. SOLOVAY        4, 78, 86

6                     MR. SKIFF            49, 82

7

8

9    DEFENDANTS'

10   EXHIBITS         DESCRIPTION            PAGE

11   Exhibit 1    Letter                      6

12   Exhibit 2    Ms. Hayward's documents    21

13   Exhibit 3    Guilfoyle exhibit          22

14   Exhibit 4    Documents                  26

15   Exhibit 4A   Letter dated 4/29/14       31

16   Exhibit 4B   Note from Jeffrey Zucker   32

17   Exhibit 5    Terry Ellis documents      33

18   Exhibit 6    Lucky Pierre documents     34

19   Exhibit 7    Letter                     38

20   Exhibit 8    Letter                     40

21   Exhibit 9    Memo                       75

22

23

24

25
```



PETER M. LEV, E.A.                                              April 20, 2015
GELTZER vs. TANE                                                          90

1

2

3                C E R T I F I C A T I O N

4

5            I, ROBERT BLOOM, a Shorthand

6    Reporter and notary public, within and for

7    the State of New York, do hereby certify:

8            That PETER M. LEV, E.A., the

9    witness whose examination is hereinbefore set

10   forth, was first duly sworn by me, and that

11   transcript of said testimony is a true record

12   of the testimony given by said witness.

13            I further certify that I am not

14   related to any of the parties to this action

15   by blood or marriage, and that I am in no way

16   interested in the outcome of this matter.

17

18            IN WITNESS WHEREOF, I have

19   hereunto set my hand this _____ day of

20   _____, 2015.

21

22                    

23            _____

24                  ROBERT BLOOM

25

DEPOSITION ERRATA SHEET

Our Assignment Number:  322088

Case Caption:  Starr, Geltzer


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


_____

PETER M. LEV, E.A.


Subscribed and sworn to on the _____ day of

_____, 2015 before me,

_____

Notary Public,

in and for the State of _____



1

2                        DEPOSITION ERRATA SHEET

3     Page No. _____ Line No. _____ Change to: _____

4     _____

5     Reason for change: _____

6     Page No. _____ Line No. _____ Change to: _____

7     _____

8     Reason for change: _____

9     Page No. _____ Line No. _____ Change to: _____

10    _____

11    Reason for change: _____

12    Page No. _____ Line No. _____ Change to: _____

13    _____

14    Reason for change: _____

15    Page No. _____ Line No. _____ Change to: _____

16    _____

17    Reason for change: _____

18    Page No. _____ Line No. _____ Change to: _____

19    _____

20    Reason for change: _____

21    Page No. _____ Line No. _____ Change to: _____

22    _____

23    Reason for change: _____

24    SIGNATURE:_____DATE:_____

25              PETER M. LEV, E.A.



1

2                    DEPOSITION ERRATA SHEET

3    Page No. _____ Line No. _____ Change to: _____

4    _____

5    Reason for change: _____

6    Page No. _____ Line No. _____ Change to: _____

7    _____

8    Reason for change: _____

9    Page No. _____ Line No. _____ Change to: _____

10   _____

11   Reason for change: _____

12   Page No. _____ Line No. _____ Change to: _____

13   _____

14   Reason for change: _____

15   Page No. _____ Line No. _____ Change to: _____

16   _____

17   Reason for change: _____

18   Page No. _____ Line No. _____ Change to: _____

19   _____

20   Reason for change: _____

21   Page No. _____ Line No. _____ Change to: _____

22   _____

23   Reason for change: _____

24   SIGNATURE:_____DATE:_____

25              PETER M. LEV, E.A.

